Vera G. TAPPE, By and Through her Husband and Duly Appointed Guardian and Conservator, Albert M. TAPPE, et al., Appellants,

v.

IOWA METHODIST MEDICAL CENTER, Hooshang Soltanzadeh, David K. Lemon, Ronald K. Grooters and John Vandehaar, Appellees.

No. 89–1473.

Supreme Court of Iowa.

Nov. 20, 1991.

Marc A. Humphrey of Humphrey & Haas, P.C., Des Moines, for appellants.

Thomas A. Finley and Glenn Goodwin of Duncan, Jones, Riley & Finley, P.C., Des Moines, for appellees Iowa Methodist Medical Center and David K. Lemon.

Robin L. Hermann and Douglas A. Haag of Patterson, Lorentzen, Duffield, Timmons, Irish, Becker & Ordway, Des Moines, for appellee John Vandehaar.

Michael H. Figenshaw and David J. Lynch of Bradshaw, Fowler, Proctor & Fairgrave, Des Moines, for appellees Ronald K. Grooters and Hooshang Soltanzadeh.

Considered by HARRIS, P.J., and LARSON, SCHULTZ, NEUMAN, and ANDREASEN, JJ.

NEUMAN, Justice.

Vera Tappe suffered a paralyzing stroke while undergoing cardiac bypass surgery.

In his capacity as her guardian, Vera's husband Albert[1] brought this suit against the cardiologist, defendant David K. Lemon; the surgeons, defendants Ronald K. Grooters and Hooshang Soltanzadeh; the perfusionist,[2] defendant John Vandehaar; the hospital, defendant Iowa Methodist Medical Center; and the manufacturer of the perfusion equipment, Shiley, Inc.[3] Plaintiff pleaded both specific acts of negligence and the doctrine of res ipsa loquitur to sustain his claim of medical malpractice against the doctors and perfusionist. His claim against the hospital rested solely on the res ipsa theory. He also made an independent claim of damages against Dr. Lemon for intentional infliction of emotional distress.

Following a two-week trial, the court directed a verdict for the hospital on the negligence count, and for Dr. Lemon on the emotional distress claim. The jury then returned a verdict for the remaining defendants. Plaintiff's motion for new trial was denied.

On appeal, plaintiff urges us to reverse on the ground the district court refused to submit his case against the hospital and medical personnel on the theory of res ipsa loquitur. Plaintiff also contends the court erred by refusing to allow the testimony of a handwriting expert, limiting the opinions offered by an expert perfusionist, failing to give a "captain of the ship" instruction, inadequately instructing on informed consent, and granting a directed verdict in favor of the cardiologist on Albert's claim of intentional infliction of emotional distress. Finding no error, we affirm.

Our scope of review is for the correction of errors at law. Iowa R.App.P. 4. Further facts will be detailed as they become pertinent to the specific issues raised on appeal.

1. Vera's children also joined in the suit to assert loss of parental consortium claims. Because this appeal relates primarily to issues of concern to the guardian, we will use the singular term "plaintiff" throughout the opinion.

2. A perfusionist is a technician trained in the operation of the heart/lung pump that takes over the patient's cardiopulmonary functions during bypass surgery.

3. Shiley settled prior to trial and is not involved in this appeal.

## I. *Res Ipsa Loquitur.*

In May 1984 Vera Tappe sought advice from her family doctor concerning recurring chest pains. She was referred to Dr. Lemon, a cardiologist, who performed a cardiac catheterization. The test revealed blockage of several arteries surrounding Vera's heart. The doctor recommended immediate treatment, either by way of angioplasty or bypass surgery. Vera chose surgery. Her decision rested in part on the fact that her husband, Albert, had undergone bypass surgery only two years earlier with good results. The same surgeon, Dr. Grooters, would perform the surgery along with Dr. Soltanzadeh.

Assisting these physicians in the surgery was John Vandehaar, the perfusionist. The surgery proceeded normally and without apparent complications. Following the operation, however, Vera failed to regain consciousness. She lapsed into a coma and a CT scan performed two days later revealed extensive brain damage suffered during surgery.

At trial, every physician called to testify acknowledged that stroke is a recognized risk of cardiac bypass surgery. All agreed that it occurs in a small percentage of patients even when all due care has been exercised by the surgeon. In fact, stroke was one of the specific risks explained to Vera before she consented to surgery. Thus the fighting issue was whether Vera's stroke was of the type commonly caused by the release of atherosclerotic emboli (*i.e.*, bits and pieces of plaque) dislodged during surgery, or whether the stroke resulted from negligence in the operation and monitoring of the perfusion equipment.

Vera's CT scan revealed diffuse, rather than localized, changes in her brain tissue following surgery. Defendants and their experts all identified this pattern as consistent with the release of atherosclerotic emboli from Vera's aortic arch. Plaintiff's expert radiologist took a contrary view, claiming the pattern was inconsistent with stroke caused by plaque. He offered the opinion that the stroke was caused by the release of excess gaseous microemboli which diminished the flow of blood, and thereby oxygen, to the brain mass. Plaintiff supported this hypothesis with other expert evidence suggesting negligence in the use of one type of oxygenator over another, failure to use an arterial line filter, and the perfusionist's failure to carefully monitor and record the partial oxygen ($PO_2$) level in Vera's blood.

Against this factual background we consider plaintiff's challenge to the court's refusal to let plaintiff establish his prima facie case of negligence against the hospital and the medical professionals through reliance on the doctrine of res ipsa loquitur. This was the only basis upon which plaintiff sought to prove the hospital's negligence. As against the other defendants, plaintiff's claims of specific negligence were submitted to, but apparently rejected by, the jury.

Plaintiff cites no legal cause to upset the jury's verdict. He merely claims the doctrine of res ipsa should have been available to him, under the record sketched above, to create a rebuttable inference of negligence on the part of the defendants. For the reasons that follow, we think the district court wisely rejected plaintiff's argument under the facts of this case.

■ It is well settled that before a plaintiff will be entitled to a res ipsa instruction, the court must decide whether plaintiff has established two foundational facts: (1) the defendant had exclusive control and management of the instrumentality that caused plaintiff's injury, and (2) the injury was of such a type as in the ordinary course of events would not have happened if reasonable care had been used. *Cronin v. Hagan*, 221 N.W.2d 748, 751 (Iowa 1974). If both elements are established, "the happening of the injury itself permits but does not compel the drawing of an inference that defendant was in fact negligent." *Id.* at 751.

Because the doctrine creates an inference of negligence without specific proof, it traditionally has been applied sparingly, particularly in medical malpractice cases. *Mogensen v. Hicks*, 253 Iowa 139, 143, 110 N.W.2d 563, 565 (1961); *Lagerpusch v.*

*Lindley,* 253 Iowa 1033, 1038, 115 N.W.2d 207, 210 (1962). We have observed that while physicians control their surgical instruments and medicine, they do not control the physical condition and reactions of their patients. *Mogensen,* 253 Iowa at 143, 110 N.W.2d at 565.

The issue of control, however, is really not at the center of the controversy before us. The district court was satisfied with proof that Vera had relinquished control of her care to the defendants when her injury occurred. It was plaintiff's failure to satisfy the second foundational element that led to the directed verdicts. Because we agree with the court's ultimate conclusion about the second prong of the test, we pass defendants' protest that the first element was not proven either.

■ We turn, then, to the question posed by the second foundational element: Would this injury have occurred, in the ordinary course of events, in the absence of reasonable care? If the answer under the record is "yes," then the doctrine is not applicable. *Cronin,* 221 N.W.2d at 751. Here the court weighed the evidence and concluded that because all the experts testified that stroke is an inherent risk of bypass surgery, the plaintiff was not entitled to the benefit of the res ipsa inference of negligence. Plaintiff contests this decision on appeal.

■ The thrust of plaintiff's argument is that the jury should have been allowed to accept or reject the res ipsa inference, and it was error for the court to decide the question as a matter of law. Plaintiff's argument points out a possible source of confusion in our prior cases. On the one hand, it has long been held that:

> [i]n cases where the plaintiff relies upon res ipsa loquitur the Court must first decide under the well-established rules having to do with the respective provinces of the Court and the jury, whether there is such evidence as to the existence of the foundation facts as to warrant submission of the case to the jury upon the theory of res ipsa loquitur.

*Highland Golf Club v. Sinclair Refining Co.,* 59 F.Supp. 911, 915 (N.D.Iowa 1945);

*Sammons v. Smith,* 353 N.W.2d 380, 385 (Iowa 1984); *see Wiles v. Myerly,* 210 N.W.2d 619, 624 (Iowa 1973) (before doctrine can be invoked plaintiff must prove existence of essential facts necessary to bring the rule into operation); *Cronin,* 221 N.W.2d at 751 (same).

In *Sammons,* however, we also said the decision need not be made *as a matter of law. Sammons,* 353 N.W.2d at 387. That means when the evidence of causation is either unavailable to the plaintiff or in conflict, but there is proof that the injury would not ordinarily occur but for negligence, the court may properly instruct the jury that it may, but is not required to, infer negligence from the happening of an event that is within the exclusive control of the defendant. *Id.*

But in the present case, the threshold question of what caused Vera's injury is not in conflict. Vera suffered a stroke. Moreover, all the experts conceded that stroke occurs in a fixed percentage of all bypass surgeries even in the absence of negligence. Given this evidence, plaintiff did not prove the second prong of the threshold res ipsa test. Thus the court properly ruled in defendants' favor on the question as a matter of law.

The fact that plaintiff tendered substantial proof that Vera's stroke might *also* have been caused by negligence is essentially irrelevant to the res ipsa inquiry. *See Reilly v. Straub,* 282 N.W.2d 688, 695 (Iowa 1979) (rarity of occurrence is not sufficient predicate for application of res ipsa loquitur doctrine; relevant portion of test is "whether the occurrence is such as in the ordinary course of events would not happen if reasonable care had been used"). Plaintiff has not been disadvantaged by proving too much. To the contrary, plaintiff's proof directly supported and strengthened his claims of specific negligence.

■ In summary, if reasonable minds might differ about whether the injury could result from surgery in the absence of negligence, the court should instruct on res ipsa and allow the jury to accept or reject the

inference that the doctrine affords. If, however, the evidence is undisputed that such injury may occur even in the absence of negligence, then the doctrine of res ipsa loquitur should not be submitted and the case should proceed to verdict on the question of specific negligence, if any be shown. In this way neither the doctor nor the plaintiff is unfairly advantaged. The playing field remains level, and res ipsa is limited, as it should be, to those circumstances where "the thing speaks for itself" and says "negligence."

## II. *Handwriting Expert.*

■ The record kept by defendant perfusionist John Vandehaar is the source of plaintiff's next assigned error.

Both in deposition and during plaintiff's direct examination at trial, Vandehaar testified that he was the sole perfusionist during the operation and he alone made notations on the record. Midway through the trial, however, plaintiff's counsel obtained the original perfusion records and noticed that some entries were written in blue ink and others in black. Counsel consulted a handwriting expert who informed him that two different people had made notations on the chart. The discovery was relayed to defense counsel.

The next day Vandehaar's counsel recalled him to the stand for the purpose of explaining the chart and his prior statements to the court and jury. Vandehaar testified that his earlier testimony was mistaken, and another perfusionist may have made some entries on the chart. He then justified his error by explaining that he had perfused nearly 3000 cases during his career and it was not uncommon for his partner to help set up for an operation and make preliminary notations. He reiterated that, in any event, he was the only perfusionist at work during Vera Tappe's operation.

Once Vandehaar recanted his earlier testimony, plaintiff's counsel attempted to put the handwriting expert on the stand. Defense counsel's objection to the testimony was sustained by the court. On appeal plaintiff contends he was impermissibly prohibited from impeaching Vandehaar's testimony, contrary to Iowa Rule of Evidence 607.[4]

It is well settled that a witness may be impeached by offering evidence in contradiction to the witness' prior testimony. *State v. Roth,* 403 N.W.2d 762, 767 (Iowa 1987); *Mercer v. Chi,* 282 N.W.2d 697, 700 (Iowa 1979); 7 Adams & Kincaid, *Iowa Practice* § 607.4, at 289–90 (1988). Moreover, the requirement that impeachment testimony relate solely to noncollateral issues, *State v. Odem,* 322 N.W.2d 43, 46 (Iowa 1982), is met in this case by the obvious relevance of who, in fact, was present at the time medical negligence allegedly occurred.

Nevertheless, no error justifying reversal appears. The expert's proposed testimony would have duplicated Vandehaar's own, albeit belated, admission. *See Kengorco, Inc. v. Jorgenson,* 176 N.W.2d 186, 189 (Iowa 1970) (error in exclusion of evidence harmless "where the same evidence is subsequently admitted and considered by the finder of fact"); *Durant Elev. Co. v. S.J. Hoffman & Sons,* 259 Iowa 500, 505, 145 N.W.2d 25, 28 (1966). Plaintiff offered no further proof that anyone else participated in the perfusion procedure beyond these few notations, or that the notations were false. The plaintiff's only real complaint is that the court deprived him of the strategic impact of painting Vandehaar a liar. Though regrettable from plaintiff's standpoint, the deprivation furnishes no basis for reversal. *See Renze Hybrids, Inc. v. Shell Oil Co.,* 418 N.W.2d 634, 639 (Iowa 1988) (exclusion of relevant evidence must be prejudicial to warrant reversal).

## III. *Expert Testimony of Perfusionist.*

■ One of plaintiff's key expert witnesses was Aaron Hill. He, like defendant Vandehaar, is a perfusionist. As previous-

---

**4.** The rule states: "The credibility of a witness may be attacked by any party, including the party calling him." Iowa R.Evid. 607.

ly noted, perfusionists are not medical doctors. They are highly trained technicians who assist in heart surgery by operating the heart/lung machine. Plaintiff examined Hill regarding the appropriate standard of care among perfusionists. Hill so informed the jury and offered his opinion that Vandehaar's conduct during Vera's surgery was substandard. This testimony proceeded without objection from defendants' counsel.

The controversy concerning Hill centers on the following question asked by plaintiff's counsel:

Mr. Hill, from your reviewing of the entire surgical record, including the perfusion record, have you formulated an opinion based upon a reasonable degree of perfusion certainty as to what caused the brain damage sustained by Vera Tappe as a result of that surgery on June 15th of 1984?

Defense counsel objected. He cited Iowa Code section 147.139 and Iowa Rule of Evidence 702 for the proposition that Hill was not qualified to answer the question. The court sustained the objection and plaintiff now asserts the ruling was erroneous.

Iowa Code section 147.139 limits expert testimony regarding standard of care to persons whose "medical ... qualifications relate directly to the medical problem ... at issue and the type of treatment administered in the case." Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Iowa R.Evid. 702.

The question is whether perfusionists are qualified to offer expert opinion on the cause of stroke during cardiac bypass surgery. In assessing the propriety of the court's exclusion of the proffered opinion, we are guided by the rule that the admission of expert testimony rests within the sound discretion of the district court. *Gail v. Clark*, 410 N.W.2d 662, 673 (Iowa 1987).

Reversal on this ground is not justified absent manifest abuse of that discretion. *Id.*

It is undisputed that Hill's perfusion qualifications are, as defendant Vandehaar's counsel concedes, "impressive." It is not enough, however, that a witness be generally qualified in a field of expertise; the witness must also be qualified to answer the particular question propounded. *Ruden v. Hansen*, 206 N.W.2d 713, 717 (Iowa 1973); *Tiemeyer v. McIntosh*, 176 N.W.2d 819, 824 (Iowa 1970). Although phrased in terms of "perfusion certainty," the question posed to Hill called for medical knowledge regarding causes of brain damage during surgery. Given Hill's lack of training outside the perfusion field, it was not an abuse of discretion for the district court to prevent him from rendering an expert opinion calling for general medical knowledge and diagnosis.

IV. *Remaining Issues.*

Plaintiff's other assignments of error merit only brief mention.

A. *Court's refusal to give a "captain of the ship" instruction.* The defendant doctors conceded at trial that they ultimately would be responsible for any negligence in the operation of the heart/lung machine during the operation. Thus in its marshaling instruction the court told the jury that Dr. Grooters and Dr. Soltanzadeh could be found negligent if the evidence revealed any negligent acts by perfusionist Vandehaar.

Plaintiff lodged no objection to the marshaling instruction. But plaintiff sought at trial, and now urges on appeal, an additional "captain of the ship" instruction. As its name implies, the proposed instruction would impose on the surgeon broad liability for the conduct of all persons present in the operating room, irrespective of their employment or agency relationship to the doctor. Because of the wide sweep of the rule, and the modern view that surgeons are leaders of a team of specialists rather than captains of a crew, its application has been widely discredited. *See generally* 2

M. Zaremski & L. Goldstein, *Medical and Hospital Negligence* §§ 27:05–27:10, at 27:9–27:21 (1990). And although some states still apply the doctrine, *see, e.g., Young by and through Young v. Carpenter*, 694 P.2d 861, 863 (Colo.App.1984), and California courts are split on the issue, *compare Schultz by and through Schultz v. Mutch*, 211 Cal.Rptr. 445, 450 (1985) (Court of Appeal opinion endorsing doctrine; California Supreme Court denied hearing and ordered no official publication), *with Truhitte v. French Hosp.*, 128 Cal. App.3d 332, 348–49, 180 Cal.Rptr. 152, 160 (1982) (disapproving doctrine), the majority of courts shun this rigid doctrine of vicarious liability. *See Sparger v. Worley Hosp., Inc.*, 547 S.W.2d 582, 584 (Tex.1977) (rejecting captain of ship concept in favor of borrowed servant doctrine); *Parker v. Vanderbilt Univ.*, 767 S.W.2d 412, 415 (Tenn.App.1988) (same).

■ We have never specifically recognized the doctrine in Iowa and are convinced we need not do so here. The marshaling instruction that was given correctly and adequately advised the jury concerning the defendant surgeons' vicarious liability for the alleged negligent acts of the perfusionist. Because the point raised by plaintiff's objection was substantially covered in another instruction, no ground for reversal appears. *Berhow v. Kroack*, 195 N.W.2d 379, 385 (Iowa 1972).

■ B. *Informed consent.* Iowa Code section 147.137 creates a presumption that informed consent has been given if certain requirements are fulfilled.[5] On appeal, plaintiff contends that the jury should have been instructed to infer negligence from any failure by the doctors to discuss every risk cited in the informed consent statute. The district court rejected this inverse application of the statute, and so do we.

■ Plaintiff testified, and the defendants conceded, that Vera was not specifically advised that stroke could result in quadriplegia or the loss of function of any organ or limb. To establish negligence for failure to obtain informed consent, however, a plaintiff must prove four things: (1) existence of a material risk unknown to the patient, (2) the physician's failure to disclose that risk, (3) that disclosure would have led a reasonable patient in plaintiff's position to reject the medical procedure or choose a different course of treatment, and (4) injury. *Pauscher v. Iowa Methodist Medical Center*, 408 N.W.2d 355, 360 (Iowa 1987). Plaintiff cites no persuasive authority for the proposition that section 147.137, standing alone, creates a presumption to aid plaintiff in his burden of proving all the elements of his cause of action. A plain reading of the statute clearly suggests that the inference created by the law is intended to benefit medical professionals, not patients.

■ C. *Intentional infliction of severe emotional distress.* The record reveals that a couple days after Vera's operation, Dr. Lemon spoke bluntly with Albert about the brain damage Vera sustained and the prospect that she would never regain consciousness or live independently of a respirator. Dr. Lemon's approach to the topic forms the basis for plaintiff's claim that the doctor intentionally caused him severe emotional distress. The district court found insufficient evidence in the record to submit the claim to the jury. We agree with its decision.

Albert testified that Dr. Lemon encouraged him to "think about unplugging" Vera, to which Albert replied he would spend every penny he had to keep her alive. According to Albert, Dr. Lemon angrily responded that Albert was a "fool" who in

**5.** The statute provides, in pertinent part:

A consent in writing to any medical or surgical procedure or course of procedures in patient care which meets the requirements of this section shall create a presumption that informed consent was given. A consent in writing meets the requirements of this section if it:

1. Sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb ... with the probability of each such risk if reasonably determinable.

Iowa Code § 147.137.

three months would be broke and Vera would die anyway. While denying that he ever used the term "unplug" in regard to Vera, Dr. Lemon conceded at trial that he misjudged Albert's sensitivity about losing the woman to whom he had been married over fifty years. Two disinterested witnesses who overheard the conversation essentially corroborated Albert's version and acknowledged that he was visibly upset by it.

It is regrettable, but insufficient from a legal point of view, that Albert regarded the confrontation as "the worst thing" that ever happened to him. Even when viewed in the most favorable light, Albert's evidence of feeling upset and confused by the heated exchange falls far short of proof necessary to sustain a prima facie case. Beyond the evidence sketched above, the record contains no proof that Albert sustained any severe emotional distress as a result of the doctor's harsh words. As we have previously stated, "[t]he law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it." *Bethards v. Shivvers, Inc.,* 355 N.W.2d 39, 44 (Iowa 1984) (quoting Restatement (Second) of Torts § 46, comment j (1965)). The district court correctly directed the verdict for Dr. Lemon on this issue.

AFFIRMED.